NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT A. GLADSTONE, ESQ., et al., | Civil Action No.: 10-652 (PGS) |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| WESTPORT INSURANCE CORPORATION, | |
| Defendant. | |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on two motions: (1) plaintiffs Robert A. Gladstone, Esq. ("Mr. Gladstone") and Szaferman, Lakind, Blumstein & Blader, P.C.'s ("SLBB") motion for summary judgment; and (2) Defendant Westport Insurance Corporation's ("Defendant") cross-motion for summary judgment.

On or about December 29, 2009, Mr. Gladstone and SLBB (collectively "Plaintiffs") filed a complaint in the Superior Court of New Jersey, seeking a declaratory judgment concerning Defendant's obligations under a malpractice insurance contract between the parties. On or about February 5, 2010, Defendant removed the action to this Court. Plaintiffs filed for summary judgment on or about January 14, 2011. Defendant filed a cross-motion for summary judgment on or about June 17, 2011.

For the reasons set forth below, this Court denies Plaintiffs' motion and grants Defendant's cross-motion.

# I

Mr. Gladstone is an attorney of the State of New Jersey.  SLBB is a law firm doing business in New Jersey.  Defendant is an insurance company that maintains a principal place of business in Kansas.  Plaintiffs seek malpractice insurance coverage from Defendant with regard to a 2009 case captioned *Merrick Wilson, et al. v. Robert A. Gladstone, Esq. and Charles J. Casale, Jr., Esq.*, Docket No. MER-L-1089-09 in the Superior Court of New Jersey, Mercer County Law Division (the "2009 Wilson Malpractice Action").

<u>Historical Disputes Related to the 2009 Wilson Malpractice Action</u>

From June 2004 through January 2006, Mr. Gladstone performed legal services for a number of individual and corporate clients in connection with the lawsuit *Merrick Wilson, et al. v. Mayor and Township Committee of Hopewell Township, et al.*, Docket No. MER-L-3597-01 in the Superior Court of New Jersey, Mercer County Law Division (the "Hopewell Zoning Matter").  The purpose of the suit was to overturn certain Hopewell Township zoning ordinances.  Before trial, Mr. Gladstone was replaced with Charles Casale, Esq.  Ultimately, the suit was unsuccessful.  Mr. Gladstone was not associated with SLBB while he worked on the Hopewell Zoning Matter.

Evidently, Mr. Gladstone was not paid the full amount of fees that he billed on the Hopewell Zoning Matter.  In September 2006, he sued, on his own behalf, at least eleven former clients, including Merrick Wilson, Presidential Hill, LLC, and John Bleimaier for $73,461.21 in unpaid fees in a matter captioned *Law Offices of Robert A. Gladstone, et al. v. John Kuhn Bleimaier, et al.*, Docket No. MER-L-2283-06 in the Superior Court of New Jersey, Mercer County Law Division (the "Collection Action").  (*See* Blumstein Decl., Ex. C).

In October 2006, Mr. Wilson and Presidential Hill, LLC responded to the Collection Action with an answer (the "2006 Wilson Answer"). (*See* Blumstein Decl., Ex. D). The 2006 Wilson Answer alleged that Mr. Gladstone's work had not "[met] the standards of professional conduct." Although not styled in the form of a counterclaim, the 2006 Wilson Answer also demanded judgment against Mr. Gladstone for $73,461.21 plus interest, counsel fees and costs of suit.

In February 2007, Mr. Bleimaier responded to the Collection Action by filing an answer and counterclaim (the "2007 Bleimaier Counterclaim"). (*See* Blumstein Decl., Ex. D). In the answer portion of his pleading, Mr. Bleimaier alleged that Mr. Gladstone breached his duty to "perform with competence." Mr. Bleimaier's counterclaim demanded judgment for an unspecified amount of "damages, interest, attorney's fees, punitive damages and cost of suit." He sought this relief in connection with three counts:

> 42. [Mr. Bleimaier] states [Mr. Gladstone and his former firm] performed services for [Mr. Bleimaier] in an incompetent and negligent manner, causing losses and damages to [Mr. Bleimaier].
> 43. [Mr. Bleimaier] states that [Mr. Gladstone and his former firm] were overpaid for services which they rendered and seeks the return of said overpayment.
> 44. [Mr. Bleimaier] states that [Mr. Gladstone and his former firm] bre[a]ched their contract for rendition of services to [Mr. Bleimaier] causing damage to [Mr. Bleimaier].

Eventually, Mr. Gladstone entered into mutual release agreements with most, but not all, of the eleven defendants in the Collection Action. On or around July 29, 2007, Mr. Bleimaier and Mr. Gladstone stipulated to the dismissal of all claims between the two regarding the Collection Action and 2007 Bleimaier Counterclaim. (Koury Decl., Ex. A.). Mr. Gladstone entered into release agreements with at least eight other defendants between June 2006 and February 2008. (*See* Koury Decl., Ex. B). Some of these arrangements were negotiated directly

by Mr. Gladstone when he was representing himself.  At some point, Mr. Gladstone retained the legal services of George T. Dougherty, Esq. to handle the Collection Action.

Peculiarly, neither Mr. Gladstone nor Mr. Dougherty negotiated a settlement agreement with Mr. Wilson concerning the Collection Action or 2006 Wilson Answer.  Mr. Dougherty apparently sent a letter to Mr. Wilson on February 26, 2008 proposing that the parties stipulate to dismissal of the case.  But, on February 29, 2008, Mr. Dougherty wrote to the Mercer County Superior Court that Mr. Wilson was "non-responsive."  (Blumstein Supp. Decl., Ex. D).  Mr. Dougherty's February 29th letter confirmed to the court that all other parties in the case had settled.  At some later date, Mr. Wilson contacted the Superior Court to determine the status of the case and was advised that it had been settled or dismissed.  (Blumstein Supp. Decl., Ex. E). It is unclear how the case was dismissed without Mr. Wilson's knowledge or consent in light of the fact that he filed an answer and Mr. Gladstone responded to that answer.

SLBB's Malpractice Insurance and Its Coverage of Mr. Gladstone

Defendant issued a professional malpractice insurance policy to SLBB for the time period from July 4, 2007 through July 4, 2008.  On or about July 24, 2007, SLBB sent a letter to Defendant via an insurance brokerage and/or agency in which SLBB advised that effective October 1, 2007, SLBB was purchasing the assets and liabilities of Mr. Gladstone's firm.  The letter also requested that Mr. Gladstone be added to SLBB's policy.

Mr. Gladstone filled out a "New Lawyer Application" form and a "Claim Supplement" form which were submitted to Defendant.  On his "Claim Supplement" form, Mr. Gladstone revealed that he had been accused of "incompetent and negligent" representation in the 2007 Bleimaier Counterclaim.  Mr. Gladstone noted on the "New Lawyer Application" that he was terminating the Zurich American Insurance Company malpractice policy for his sole practitioner

firm (the "Zurich Policy") without filing a claim.  Mr. Gladstone requested that Defendant

"extend coverage for services rendered while [Mr. Gladstone] was associated with any prior law

firm(s)."  SLBB was notified on February 9, 2008 that Mr. Gladstone had been added to SLBB's

policy.

Defendant issued SLBB a malpractice insurance policy for the policy period from July 4,

2008 through July 4, 2009 (the "2008-2009 Policy").  The 2008-2009 Policy again included an

endorsement concerning Mr. Gladstone (the "Prior Firm Endorsement").   The Prior Firm

Endorsement amended the 2008-2009 Policy's definition of insured to include Mr. Gladstone "as

respects legal services rendered by [Mr. Gladstone] while associated with a PRIOR FIRM."  The

Prior Firm Endorsement included a signature block for an authorized representative of SLBB.

Included above the signature block was the declaration "All other terms of this policy shall

remain unchanged.  This endorsement forms a part of the policy to which attached . . . ."

(Koury's Decl., Ex. D, p. 31 of 54).

Defendant's Denial of Coverage of the 2009 Wilson Malpractice Claim

In May of 2009, Mr. Gladstone was served with the 2009 Wilson Malpractice Complaint.

In that action, plaintiffs Mr. Wilson and Presidential Hill, LLC charged Mr. Gladstone with

malpractice for his work on the Hopewell Zoning Matter, the same subject matter as the 2007

Bleimaier Counterclaim.  The specific allegations in the 2009 Wilson Malpractice Complaint are

that Mr. Gladstone failed to obtain expert witnesses which were needed for trial, failed to add a

specific corporate plaintiff to the case, and failed to call a government agency to testify.

Plaintiffs forwarded the 2009 Wilson Malpractice Complaint to Defendant along with a

request that Defendant both defend and indemnify Plaintiffs against the malpractice action.  By

letter dated June 10, 2009, Defendant affirmatively disclaimed coverage under the 2008-2009

Policy, and refused to provide either defense or indemnification.  Defendant's letter explained that coverage was denied because the 2009 Wilson Malpractice Complaint and the 2007 Bleimaier Counterclaim were considered one "claim" which originally arose in 2007, before the 2008-2009 Policy's coverage period commenced.

<u>Terms of the 2008-2009 Policy Under Which Coverage Was Sought</u>

A number of terms in the 2008-2009 Policy are relevant to Defendant's denial of coverage for the 2009 Wilson Malpractice Claim.  Of utmost importance is the fact that the 2008-2009 Policy only covers claims that are both made against the insured during the policy term and reported to the Defendant during the policy term.  This excerpt from the 2008-2009 Policy explains the mechanism:

> [Defendant] shall pay . . . all LOSS in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any Insured during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter . . . .

Of equal significance in this matter is the definition of a "claim."  The 2008-2009 Policy General Terms & Conditions provides that "'CLAIM' MEANS a demand upon any INSURED for LOSS . . . including, but not limited to, service of suit or institution of arbitration proceedings or administrative proceedings against any INSURED."  This definition places great weight on the meaning of "loss", which is defined in the Lawyers Professional Liability Coverage Unit.

> "LOSS" . . . MEANS the monetary and compensatory portion of any judgment, award or settlement, provided always that LOSS shall not include:
>
> 1.  civil or criminal fines, penalties, fees or sanctions;
> 2.  punitive or exemplary damages, including the multiplied portion of any multiple damages;
> 3.  the return by any INSURED of any fees or remuneration paid to any INSURED; or

4. any form of non-monetary relief.

The meaning of "claim" is also greatly affected by Section X of the General Terms & Conditions of the 2008-2009 Policy. Under the heading "Multiple Insureds, Claims and Claimant," it is explained that:

> Two or more CLAIMS arising out of a single WRONGFUL ACT, as defined in each of the attached COVERAGE UNITS, or a series of related or continuing WRONGFUL ACTS, shall be a single CLAIM. All such CLAIMS whenever made shall be considered first made on the date on which the earliest CLAIM was first made arising out of such WRONGFUL ACT . . . .

# II

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists only if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such a fact is considered material only if the fact may affect the outcome of the litigation based upon the substantive law. *Ibid.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

After a party files a motion for summary judgment, along with supporting papers, the non-moving party "must produce specific facts showing that there is a genuine issue for trial." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985) (citation omitted). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary

judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (*citing* Fed. R. Civ. P. 56(e)).

Here, as mentioned above, both Plaintiffs and Defendant move for summary judgment. Such competing motions "are no more than a claim by each side that it alone is entitled to summary judgment." *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (internal quotation marks and citation omitted).  The fact that both sides to a dispute have moved for summary judgment does not require the Court to grant summary judgment in one side's favor.  *See F.A.R. Liquidating Corp. v. Brownell*, 209 F.2d 375, 380 (3d Cir. 1954) ("[I]t is well established that cross-motions for summary judgment do not warrant the trial court granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.") (citations omitted).  Put differently, "[t]he fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).

## III

The critical issue in both Plaintiffs' motion and Defendant's cross-motion is whether the 2008-2009 Policy obligates Defendant to defend and indemnify Mr. Gladstone with respect to the 2009 Wilson Malpractice Complaint.  Defendant offers the following rationales for why Defendant is not obligated to defend and/or indemnify Mr. Gladstone: (1) the 2009 Wilson Malpractice Complaint constitutes a claim that technically was made prior to the 2008-2009 Policy's coverage period; (2) the 2008-2009 Policy's "prior knowledge" exclusion applies; and (3) the 2008-2009 Policy's "other collectible insurance" exclusion applies.  Plaintiffs dispute

each of Defendant's three arguments.  Plaintiffs further contend that the Prior Firm Endorsement

supercedes any provisions of the 2008-2009 Policy which would prevent coverage of the 2009

Wilson Malpractice Complaint.

General Principles of New Jersey Insurance Law

Since the parties agree that New Jersey law controls in this case, it is applied herein.

Accordingly, this Court must consider all New Jersey Supreme Court precedent on point.

*Illinois Nat'l Ins. Co. v. Wyndham Worldwide Ops., Inc.*, 653 F.3d 225, 231 (3d Cir. 2011)

(citations omitted).  Where such precedent is lacking, this Court must predict how the New

Jersey Supreme Court would resolve the issue.  *Ibid.* (citations omitted).  This prediction

requires consideration of: (1) the New Jersey Supreme Court's rulings in related areas; (2)

precedent from New Jersey's intermediate courts; (3) federal court interpretations of New Jersey

law; and (4) other decisions that have discussed the issue.  *Ibid.* (citation omitted).

New Jersey law provides that the interpretation of insurance contract terms is a matter of

law for the court.  *Duddy v. Government Employees Ins. Co.*, 23 A.3d 436, 438 (N.J. Super. Ct.

App. Div. 2011).  In analyzing the policy language, the "plain and ordinary meaning" of the

terms will control.  *Jolley v. Marquess*, 923 A.2d 264, 271 (N.J. Super. Ct. App. Div. 2007)

(citing *Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1260 (N.J. 1992)).  However, when

the policy language is unclear, the "ambiguit[y] . . . [is] to be interpreted in favor of the insured .

. . ."  *Ibid.* (quoting *Gibson v. Callaghan*, 730 A.2d 1278, 1282 (N.J. 1999)).  An insurance

contract is ambiguous "where the phrasing of the policy is so confusing that the average

policyholder cannot make out the boundaries of coverage."  *Lane v. Tishman Const. Corp. of

N.J.*, 2007 WL 1062182, at *4 (N.J. Super. Ct. App. Div. April 11, 2007) (quoting *Weedo v.

Stone-E-Brick, Inc.*, 405 A.2d 788, 795 (N.J. 1979)).  The court's construction of the policy must

also comport with the reasonable expectations of the insured. *Jolley*, 923 A.2d at 272 (citing *Gibson*, 730 A.2d at 1283).

Once the insurance policy has been construed by the Court, the insured has the burden of bringing its claim within the basic terms of the policy. *Arthur Andersen LLP v. Fed. Ins. Co.*, 3 A.3d 1279, 1287 (N.J. Super. Ct. App. Div. 2010). If the insured carries his/her burden then the insurer has the burden of proving that an exclusion applies. *Restoration Risk Retention Grp., Inc. v. Selective Way Ins. Co.*, 2011 WL 4808211, at *3 (N.J. Super. Ct. App. Div. Oct. 12, 2011) (citing *Princeton Ins. v. Chunmuang*, 698 A.2d 9, 16-17 (N.J. 1997)).

The 2009 Wilson Malpractice Complaint Is an Untimely Claim Because it is Related to the 2007 Bleimaier Counterclaim and Therefore Arose Before the 2008-2009 Policy Term.

Defendant maintains that no coverage exists because the claim in the 2009 Wilson Malpractice Complaint technically arose prior to the commencement of coverage under the 2008-2009 Policy. The 2008-2009 Policy is a "claims made and reported" policy. A claim can only be covered if it is presented to the insured during the 2008-2009 Policy's term and reported to the insurer within the term. There is no dispute that 2009 Wilson Malpractice Complaint was presented to the Plaintiffs and reported to the Defendant during the 2008-2009 Policy term.

Defendant comes to the conclusion that the 2009 Wilson Malpractice Complaint is untimely in three steps: (1) the 2006 Wilson Answer and/or 2007 Bleimaier Counterclaim constitute a "claim" as defined by the 2008-2009 Policy; (2) the 2006 Wilson Answer and/or 2007 Bleimaier Counterclaim were first made prior to the commencement of the 2008-2009 Policy period; and (3) the 2006 Wilson Answer and/or 2007 Bleimaier Counterclaim and the 2009 Wilson Malpractice Complaint are considered one claim because they all arose out of a "single Wrongful Act . . . or a series of related or continuing Wrongful Acts." (*See* Defendant's

10

Moving Br., p. 12).

*The 2007 Bleimaier Counterclaim is a Claim as Defined by the 2008-2009 Policy.*

This Court must first determine if the 2006 Wilson Answer and/or the 2007 Bleimaier

Counterclaim were "claims" as defined by the 2008-2009 Policy.  A claim is defined as a

demand made upon any insured for "loss."  (Plaintiffs' Statement of Undisputed Material Facts,

¶ 26).   Thus, the argument turns on whether the 2006 Wilson Answer or 2007 Bleimaier

Counterclaim sought damages that would constitute losses.  The 2008-2009 Policy defines the

term loss as:

> [T]he monetary and compensatory portion of any judgment, award
> or settlement, provided always that LOSS shall not include
> . . .
> 2.   punitive or exemplary damages, including the multiplied
> portion of any multiple damages;
> 3.  the return by any INSURED of any fees or remuneration paid to
> any insured; or
> 4.  any form of non-monetary relief.

There is no dispute about what relief was sought in the 2007 Bleimaier Counterclaim to

the Collection Action.  The 2007 Bleimaier Counterclaim "demands judgment against plaintiffs

for damages. . . ."  (Defendant's Statement of Undisputed Material Facts, ¶ 21; *see also*

Blumstein Decl., Ex. D).   The first count of the counterclaim asserts that Mr. Gladstone

"performed services . . . in an incompetent and negligent manner, causing losses and damage to

defendant."  (Defendant's Statement of Undisputed Material Facts, ¶ 21; *see also* 2007 Bleimaier

Counterclaim ¶ 42, filed as Blumstein Decl., Ex. D).  Thus, the 2007 Bleimaier Counterclaim

demanded an unspecified amount of compensatory damages based on a negligence cause of

action.  Compensatory damages are losses as defined by the 2008-2009 Policy.  The 2007

Bleimaier Counterclaim demanded losses; it is a claim as defined by the 2008-2009 Policy.[1]

> *The 2009 Wilson Malpractice Complaint is Related to the 2007 Bleimaier Counterclaim and Therefore Will Be Treated as if it Arose in 2007.*

The timing of the 2007 Bleimaier Counterclaim and its relationship to the 2009 Wilson Malpractice Complaint now becomes critical.  The second step in Defendant's argument is that the 2007 Bleimaier Counterclaim arose before the 2008-2009 Policy term commenced.  It is undisputed that the 2007 Bleimaier Counterclaim was made on February 6, 2007 and the 2008-2009 Policy term began on July 4, 2008.  (Defendant's Statement of Undisputed Material Facts, ¶ 19).

The final step in Defendant's argument is that the 2007 Bleimaier Counterclaim and the 2009 Wilson Malpractice Complaint are considered one "claim" by the 2008-2009 Policy's terms and that this aggregated claim is backdated to February 6, 2007, before the 2008-2009 Policy period commenced.  This argument relies on Section X of the 2008-2009 Policy, the "inter-related wrongful act" provision.[2]  (Defendant's Moving Br., p. 15).  This Court has identified no New Jersey Supreme Court precedent on the subject of inter-related wrongful act provisions.  Accordingly, this Court must use the available case law to predict how the New Jersey Supreme Court would interpret the provision.  The 2008-2009 Policy provision reads:

> Two or more CLAIMS arising out of a single WRONGFUL ACT,
> as defined in each of the attached COVERAGE UNITS, or a series

---

[1]

Because the 2007 Bleimaier Counterclaim is a claim, this Court need not decide whether the 2006 Wilson Answer also satisfies the criteria to be classified as a claim.

[2]

Plaintiffs refer to Section X as an "inter-related wrongful act" provision.  (Defendant's Moving Br., p. 15).  Plaintiffs describe the same provision as an "anti-stacking" term.  (Plaintiffs' Moving Br., p. 11).  On the semantics, the Court sides with Defendant and will refer to Section X as an inter-related wrongful act provision.

of related or continuing WRONGFUL ACTS, shall be a single
CLAIM. All such CLAIMS whenever made shall be considered
first made on the date on which the earliest CLAIM was first made
arising out of such WRONGFUL ACT, as defined in the
applicable COVERAGE UNIT, and all such CLAIMS are subject
to one "Per Claim Limit of Liability" and deductible.

Plaintiffs insist that the inter-related wrongful act provision is either invalid or cannot

validly be construed as eliminating insurance coverage.  (Plaintiffs' Moving Br., pp. 11-15).  In

support, Plaintiffs cite *Carlson Marketing Group, Inc. v. Royal Indemnity Co*, in which the

federal district court for Minnesota was confronted with two insurance contract provisions that it

found to be ambiguous in tandem.  517 F. Supp. 2d 1089 (D. Minn. 2007).  One provision

provided that the policy covered "any 'Claim' . . . made against the Insured for any 'Wrongful

Act' caused by the manufacture, use, development, distribution, advertising or sale of a 'Covered

Product' . . . occurring within the term of this policy."  *Carlson Mktg. Grp.*, 517 F. Supp. 2d at

1098.  The second provision aggregated "any covered wrongful acts" concerning the same

product into one "covered wrongful act."  *Carlson Mktg. Grp.,* 517 F. Supp. 2d at 1099.  The

court found that this second provision was ambiguous because the term "covered" was not

defined in the policy as it related to that clause.  *Carlson Mktg. Grp.,* 517 F. Supp. 2d at 1100.

The *Carlson Marketing Group* holding was premised on the poor drafting of the provisions –

most importantly the failure to define "covered."  The case is fact sensitive and cannot be read so

broadly as to stand for the proposition that all inter-related wrongful act provisions are invalid.

A number of courts have enforced inter-related wrongful act provisions similar to Section

X of the 2008-2009 Policy.  In *G-I Holdings v. Hartford Fire Insurance Co.*, a federal court

predicted how the New Jersey Supreme Court would analyze a "claims made and reported"

directors and officers insurance policy.  2007 WL 842009, at \*\*4, 6 (D.N.J. Mar. 16, 2007).  The

policy included a inter-related wrongful act provision which stated that:

> All Claims arising out of the same Wrongful Act or Interrelated
> Wrongful Acts . . . shall be considered a single Claim.  Such
> Claims shall be deemed to be first made on the date the first such
> Claim is made or deemed to be made pursuant to Section VIII.(A)
> of this Policy, regardless of whether such date is before or during
> the Policy Period.

> 2007 WL 842009, at *4

The court in *G-I Holdings*, found that the inter-related wrongful act provision was clear and should be enforced as written.  2007 WL 842009, at * 8.  As a result the plaintiff could not obtain coverage from the insurer; the inter-related wrongful act provision rendered the claim untimely.  2007 WL 842009, at * 8-9, *aff'd*, 586 F.3d 247, 257-58 (3d Cir. 2009).

A nearly identical provision[3] was enforced by the New Jersey Superior Court Appellate Division in the case of *Passaic Valley Sewerage Commissioner v. St. Paul Fire and Marine Insurance. Co*.  2010 WL 772299 (N.J. Super. Ct. App. Div. Mar. 8, 2010).  The procedural posture was a dispute between two insurers.  2010 WL 772299, at * 1.  The appellate court agreed with the lower court's opinion that the provision was "unambiguous" and should be enforced.  2010 WL 772299, at ** 2-3.  As a result, the second insurer avoided all liability because the insured's claim was related back to a claim occurring before the second insurer's policy took force.  2010 WL 772299, at ** 2-3.

The opinions in *G-I Holdings* and *Passaic Valley* are well-reasoned and persuasive to this Court.  There is no fundamental conflict between a clearly drafted inter-related wrongful act

---

[3] This inter-related wrongful act provision read: "We'll consider all claims or suits arising out of the same wrongful act or series of related wrongful acts to be one claim or suit and to have been made or brought on the date that the first of such claims or suits was first made or brought, regardless if that date is before or during the policy period."  2010 WL 772299, at *2.

provision and New Jersey law which would preclude enforcement.

Plaintiffs allege four ambiguities in the 2008-2009 Policy's inter-related wrongful act provision: (1) the heading of Section X (Multiple Insured, Claims and Claimant) is unclear; (2) the provision could be perceived as an "anti-stacking" clause; (3) the provision materially changed the meaning of the term "claim" which was defined elsewhere; and (4) the provision conflicted with the Prior Firm Endorsement. (Plaintiffs' Moving Br., pp. 11-15). The provision must be construed in a manner that meets the expectations of a reasonable insured. *Jolley v. Marquess*, 923 A.2d 264, 272 (N.J. Super. Ct. App. Div. 2007) (citation omitted). This Court also notes that the provisions in *G-1 Holdings* and *Passaic Valley* differ from the 2008-2009 Policy provision. The provisions in both prior cases explained that aggregated claims would be backdated to when the first related claim arose "regardless of whether such *date is before* or during *the Policy Period.*" *G-I Holds. v. Hartford Fire Ins. Co.*, 2007 WL 842009, at *4 (emphasis added); *see also Passaic Valley Sewerage Comm'r v. St. Paul Fire and Marine Ins. Co*, 2010 WL 772299, at *2. The 2008-2009 Policy lacks this warning.

After reviewing the relevant law, this Court finds that the 2008-2009 Policy's inter-related wrongful act provision is clear and should be enforced as written. While the *G-I Holdings* inter-related wrongful act provision provided even more clarity, the 2008-2009 Policy's provision is not unclear. It does not include any undefined terms and is not so lengthy or convoluted that the average insured (especially the average lawyer!) would be unable to predict its effect in cases such as this one. Furthermore, this Court does not find merit in

Plaintiffs' first three asserted ambiguities.[4]  The heading of the provision is not ambiguous.  The inter-related wrongful act provision is implicated whenever insured is served with multiple claims – just as the heading indicates.  Additionally, Plaintiffs' subjective misunderstanding that the clause was an anti-stacking provision is not an objective ambiguity.  The text makes the provision's effect clear, regardless of the terminology used to describe it.  Finally, the fact that the inter-related wrongful act provision affects the meaning of "claim" without being referred to in the definition of claim does not render the provision ambiguous.  A contract must be read as one document to determine the interaction of its various provisions.  *See Hardy v. Abdul-Matin*, 965 A.2d 1165, 1170 (N.J. 2009).  Insureds are not entitled to assume that all relevant provisions concerning a policy term will be grouped together.

Defendant has the burden of proving that the inter-related wrongful act provision applies in this case because it operates as an exclusion.  *First Trenton Indem. Co. v. River Imaging, P.A.*, 2009 WL 2431649, at *4 (N.J. Super. Ct. App. Div. Aug. 11, 2009) (citing *Carter-Wallace, Inc. v. Admiral Ins. Co.*, 712 A.2d 1116, 1126-27 (N.J. 1998)).  Plaintiffs do not contend that the 2008-2009 Policy's definition of "wrongful act"[5] is ambiguous or that the term "related" is ambiguous.  Related is commonly understood to be a broad term.  Accordingly, courts have found that claims are related when there is a logical connection between them, even if different plaintiffs brought them.  *In re DBSI, Inc.*, 2011 WL 3022177, at *4 (Bankr. D. Del. July 22, 2011) (collecting cases).  The 2007 Bleimaier Counterclaim alleged that Mr. Gladstone's work

---

[4]

Plaintiffs' last argument concerning the conflict between the Prior Firm Endorsement and the 2008-2009 Policy is addressed separately at the end of this opinion.

[5]

The 2008-2009 Policy defines wrongful acts as "act[s], error[s], [and] omission[s] . . . in the rendition of legal services for others . . . ."  (Koury Decl., Ex. D., p. 21).

on the Hopewell Zoning Matter constituted negligence.  (Defendant's Statement of Undisputed

Material Facts, ¶ 21).   The 2009 Wilson Malpractice Complaint alleged that Mr. Gladstone's

work on the Hopewell Zoning Matter constituted "negligen[ce] and professional malpractice."

(Defendant's Statement of Undisputed Material Facts, ¶ 47).  No genuine issue of fact is present.

No reasonable jury could stray from the conclusion that the 2007 Bleimaier Counterclaim and

the 2009 Wilson Malpractice Complaint arose from related wrongful acts – Mr. Gladstone's

alleged negligence during his work on the Hopewell Zoning Matter.

Under the terms of the 2008-2009 Policy, the 2009 Wilson Malpractice Complaint was a

claim first made in February 2007 when the 2007 Bleimaier Counterclaim was served on Mr.

Gladstone.   The claim was made before the 2008-2009 Policy term commenced and is not

covered by the terms of the 2008-2009 Policy.[6]

The Prior Firm Endorsement Does Not Compel Coverage of the 2009 Wilson
Malpractice Complaint.

Finally, Plaintiffs' contend that the Prior Firm Endorsement requires coverage in this

case.  The Prior Firm Endorsement redefines the 2008-2009 Policy's coverage to include "legal

services rendered by [Mr. Gladstone] while associated with a PRIOR FIRM."  (Plaintiffs'

Statement of Undisputed Material Facts, ¶ 16).  Plaintiffs believe that the Prior Firm

Endorsement provides unconditional coverage for any claim arising out of Mr. Gladstone's

activities at his prior firm.  (Plaintiffs' Moving Br., pp. 9, 14-15).  Plaintiffs assert that the Prior

Firm Endorsement trumps any conflicting terms in the 2008-2009 Policy that would prevent

---

[6]

This Court's conclusion that the 2009 Wilson Malpractice Complaint is not covered by the 2008-
2009 Policy renders discussion of the policy's "prior knowledge" and "other insurance"
exclusions moot.

coverage.  (*See* Plaintiffs' Reply Brief, p. 1).

This Court is not persuaded by this argument.  An endorsement must be read together with the rest of the insurance policy.  *See Aetna Cas. & Sur. Co. v. Morton Intern. Inc.*, 1995 WL 865782, at *2 (N.J. Super. Ct. Law Div. Aug. 7, 1995); *see also Farmers Ins. Exchange v. Ledesma*, 214 F.2d 495, 498 (10th Cir. 1954) ("It is the general rule that an endorsement or rider attached to an insurance policy becomes and forms a part of the contract; that the policy and the endorsement or rider shall be construed together.") (citations omitted).  An endorsement only supersedes the terms in the main policy if the two conflict.  *Buntin v. Continental Ins. Co.*, 583 F.2d 1201, 1206 (3d Cir. 1978).

The Prior Firm Endorsement does not conflict with the 2008-2009 Policy's terms.  In fact, a review of the Prior Firm Endorsement reveals that it does nothing more than amend the 2008-2009 Policy's definition of"insured" to include Mr. Gladstone with respect to the work that he conducted at his prior firm.  (*See* Koury Decl., Ex. D, p. 31).  Because this amendment was to a term of the 2008-2009 Policy, it is clear that the remaining terms of the 2008-2009 Policy would still govern, including the definition of claim and the inter-related wrongful act provision.  Indeed, above the signature block on the Prior Firm Endorsement, it is stated that "[a]ll other terms and conditions of this policy shall remain unchanged."  (Koury Decl., Ex. D, p. 31).  The Prior Firm Endorsement does not supercede or supplement the 2008-2009 Policy's terms except to redefine the term "insured."  There is no ambiguity in the Prior Firm Endorsement or in the Prior Firm Endorsement's interaction with the main 2008-2009 Policy that would allow this Court to rewrite the 2008-2009 Policy for Plaintiffs' benefit.

Furthermore, Plaintiffs' expectation of unlimited coverage is grounded in extrinsic evidence, not the terms of the Prior Firm Endorsement.  Specifically, Plaintiffs point to (1)

communications from their insurance agent and (2) a Defendant-authored newsletter article written concerning insurance endorsements for new attorney hires with potential liability at prior firms. (Plaintiffs' Moving Br., p. 14). New Jersey law allows reference to extrinsic evidence to illuminate the meaning of contractual terms in all cases. *Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 346-47 (N.J. 2006). However, extrinsic evidence cannot be used to modify or supplement the terms of a contract. *Id.* at 347. As discussed above, the terms of the Prior Firm Endorsement and its interaction with the 2008-2009 Policy are clear. Extrinsic evidence cannot be used to change this clear meaning. The Policy Endorsement cannot overcome the 2008-2009 Policy's inter-related wrongful act provision and save coverage of Plaintiffs' claim.

What is unusual here is that the malpractice complaints made against Mr. Gladstone by Mr. Wilson were never resolved and instead reemerged years later. While Mr. Gladstone made efforts to settle with all of his former clients, it appears that Mr. Wilson's case was never conclusively closed. *See* N.J. Rule 4:37-1. This was an oversight. At any rate, Mr. Gladstone's failure to resolve Mr. Wilson's allegations arising out of the Hopewell Zoning Matter, an event of which Mr. Gladstone should have known, resulted in a gap in coverage.

## IV

This Court has reviewed all submissions. This Court finds that the 2009 Wilson Malpractice Complaint is specifically excluded from coverage by the 2008-2009 Policy's inter-related wrongful act provision. Defendant does not have a duty to defend or indemnify Plaintiffs with respect to the 2009 Wilson Malpractice Complaint. For the reasons set forth in the above Memorandum,

IT IS on this 15TH  day of November 2011,

ORDERED that Plaintiffs' Motion (Docket Entry 22) is denied; and

ORDERED that Defendant's Cross-Motion (Docket Entry 28) is granted.


                              *s/Peter G. Sheridan*
                              PETER G. SHERIDAN, U.S.D.J.